IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DESTIN WILLIAMS and KIM WILLIAMS, on behalf of themselves and all others similarly situated, | *<br>*<br>*<br>* |
| Plaintiffs, | *<br>* |
| vs. | * CIVIL ACTION 19-00739-KD-C<br>* |
| THE CITY OF ORANGE BEACH, ALABAMA, et al., | *<br>*<br>* |
| Defendants. | * |

## REPORT AND RECOMMENDATION

This cause is before the undersigned Magistrate Judge for the issuance of a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(3) and S.D. Ala. Gen. LR 72(a)(2), on the Plaintiffs' Motion to Remand (Doc. 10), Defendant's Response in Opposition to Remand (Doc. 12), the affidavit of Ford Handley (Doc. 28), the Response filed by Plaintiffs on February 28, 2020 (Doc. 29), Plaintiffs' Amended Complaint (Doc. 42), and the evidence presented during an evidentiary hearing held on October 27, 2020. The Court has also had the benefit of oral argument presented on the issues relevant to the motion to remand on February 20, 2020 and October 27, 2020.

Based on the evidence presented, the Court finds that the Impact Fees imposed by the City of Orange Beach, Alabama constitute taxes on new development, and not fees attributable to the impact of new development within the City. Accordingly, in light of Tax Injunction Act, 28 U.S.C. § 1341, it is determined that the conflict in the factual presentations should be resolved in favor of the Plaintiffs, and that this action should be REMANDED to the Circuit Court of Baldwin County, Alabama.

I.   **FINDINGS OF FACT**

On April 4, 2006, the Alabama Legislature approved Alabama Legislative Act. No. 2006-300, codified at Ala. Code § 45-2-243.80, *et. seq*. (the "Act"), a Local Act which authorized Baldwin County, Alabama and municipalities in Baldwin County to "assess and collect impact fees on new development for governmental infrastructure purposes." Impact fees are defined by the Act as a "charge or assessment imposed by a political subdivision against new development in order to generate revenue for funding or recouping the costs of governmental infrastructure necessitated by and attributable directly to the new development." Ala. Code § 45-2- 243.81(2). A municipality in Baldwin County may not enact or impose an impact fee, except in accordance with the Act. Ala. Code § 45-2- 243.82(a). The Act provides that Baldwin County "[m]unicipalities may enact or impose impact fees only on land within their corporate limits by complying with this subpart." Ala. Code § 45-2-243.82(b). Upon this authority, the City of Orange Beach, Alabama (the "City") passed Ordinance No. 2006-986 (the "Ordinance") on September 25, 2006. (Hearing Exhibit 1).[1] The Ordinance established a program for imposing and collecting Impact Fees within the City.

---

[1] The impact fee Ordinance was amended once on December 16, 2008. (Hearing Exhibit 2). According to City Administrator Kenneth R. Grimes, Jr., the change in the Amendment was to increase the length of time within which the City could use impact fees. The period of time was changed from two years to five years. Compare Hearing Exhibit 1, § 8(3) and Hearing Exhibit 2, § 2(c). It also appears, however, that a significant change was made as to the use of the impact fees exacted. Municipal Ordinance 2006-986 § 5 (Procedure for Establishing or Increasing Impact Fees) was changed as well. Section 5 (4) of the 2006 Ordinance provided that "[n]o impact fee or any portion of an impact fee may be assessed for or expended upon the operation or maintenance of any public facility, or for the construction or improvement of any public facility that does not create additional capacity." In the amended ordinance, the above language was changed to provide that "[a]n impact fee can be assessed for the maintenance and upkeep of facilities or resurfacing of roadways where needed because of the impact of new development." Municipal Ordinance 2008-1077, § 1(d).

The Act further provides that "[a]n impact fee per service unit of new development may be set by the political subdivision not to exceed one percent of the estimated fair and reasonable market value of the new development after completion." Ala. Code § 45-2-243.84(a)(1). The City calculates the estimated fair and reasonable market value by adding the following values associated with new developments: the value of the building, improvements value, and the land value associated with the building. (Hearing Exhibit 4, "Impact Fee Calculation Worksheet[s]"). This statutory one percent limitation on Impact Fees that may be imposed and collected by Baldwin County and the municipalities located within the county was incorporated into the City's Ordinance. The Ordinance states that impact fees imposed, "shall not exceed one percent of the fair market value of each service unit." Municipal Code § 6(2) (2006) (Hearing Exhibit 1, p. 4).

In order to calculate the amount of impact fees to be charged under the Ordinance, in 2006 the City engaged TischlerBise, a consulting firm based in Bethesda, MD, to complete a study on public infrastructure that set forth an opinion of the "maximum supportable" impact fees assessable for various types of developments (hereinafter, the "Study") (Hearing Exhibit 5). The Study set forth separate "maximum supportable" impact fees for new developments impacting (a) parks and recreation, (b) fire, (c) police, (d) transportation and (e) libraries. Each of these categories support a separately identifiable impact fee assessed on new developments on invoices submitted by the City to developers. (*Id*. at pp. 5-8). The City adopted the "maximum supportable" impact fees from the Study to create an "Impact Fee Schedule." This Schedule was adopted by the City through Impact Fee Resolution No. 2669 dated October 7, 2006. (Hearing Exhibit 3). It is not disputed that the City has not revised the "maximum supportable fees" or reviewed the metrics upon which those fees were calculated during the 14 years since those fees were first established.

Since 2006, the City has charged impact fees as a condition for developers to receive building permits for new construction. The City produced "Impact Fee Worksheets" demonstrating the calculation of each impact fee assessed between 2006 and 2020. Hearing Exhibit 4. This evidence demonstrates that, regardless of the amount calculated by the Study as the "maximum supportable" impact fee, the fee the City actually collected was most often one percent of the combined values of the buildings and land under development. The only instances in which the maximum supportable impact fee was actually charged pursuant to the Study are certain rare occasions where one percent of the land and building values exceeded the calculated maximum fee.[2]

While the Study computed generalized, "maximum supportable" fee structures for residential and commercial developments, the Court finds that the City failed to undertake individualized inquiries into the potential impacts of any proposed, new development before charging specific impact fees. Rather, for each new development which has been charged an impact fee since 2006, the City determined the fee by inputting the land value and proposed building value into a Microsoft Excel spreadsheet that was designed to output the "maximum supportable fee" for the development in question, subject to the Act's statutory 1% cap. The calculations within this spreadsheet have not been changed since 2006.

The City does not charge impact fees in certain instances. Katherine Alexander, the City's Director of Community Development and former City Engineer, testified that if a new residential development is built on the site of a pre-existing residential development, the City will not impose

---

[2] "Alabama's enabling legislation allows for impact fees not exceeding one (1%) percent of the estimated fair and reasonable market value of the new development after completion. The City of Orange Beach will calculate this 1% of value maximum for each new unit or development, as applicable. Due to this provision in the law, the City may be able to collect only a portion of the maximum supportable fee amounts presented here." Hearing Exhibit 5, p. 6.

an impact fee, regardless of the fact that the new development may cause a marked increase in demand on City services. Mrs. Alexander testified that no impact fee would be charged in such a situation, regardless of any discrepancy in size between a pre-existing house and the proposed new development.

The Ordinance contains language designed to present policy reasons and procedures to ensure that the impact fees qualify as fees as opposed to taxes. It was evident from the testimony, however, that the City has deviated from the requirements of its Ordinance for administrative and financial reasons. First, although significant effort was made to formulate a methodology for recovering infrastructure costs occasioned by new development, that formula was effectively trumped by the inclusion of a one percent cap based in substantial part on estimated land values associated with the development project.

Secondly, instead of depositing the impact fees in a special interest-bearing account as required by § 7 of the Ordinance (Hearing Exhibit 3, p. 4), the revenue was deposited in the general account of the City. The City argues that this was fiscally responsible due to low interest rates available on interest bearing accounts versus the fees charged for maintaining such accounts. Thus, depositing the funds into the general fund with internal accounting procedures to track receipts and disbursements was the chosen path without any change to the Ordinance.

Third, the Ordinance requires that impact fees are to be reviewed annually, Municipal Code § 10 (2006) (Hearing Exhibit 1, p. 5), but the evidence is that this annual review has never been performed. Nor has the City taken any steps to review or revise the methodologies, or the underlying data, which were used in the Study to determine "maximum supportable" impact fees in 2006. Additionally, the "maximum supportable" fees in the 2006 Study were calculated with the assumption that the City would incur annual fees to TischlerBise to review the Study. That the

City would incur those fees was integral to the Study's calculation of "maximum supportable fees" in 2006, but those fees were never incurred because the City never hired TischlerBise to perform such annual audits or reviews. Mr. Bise testified that a good "rule of thumb" would be for the Study to be reviewed and updated every 5-7 years. The City's Study has never been updated.

Fourth, the Act and the Ordinance state that Impact Fees are to be, "necessitated by and attributable directly to the new development." However, a majority of the fees charged are based in substantial part on the value of the real property underlying the new development. The Court also finds that the City has failed to correlate or track its collection of impact fees to the expenditure of such fees on specific projects. This is due, in part, to the City's decision not to segregate the impact fee funds in a separate, interest-bearing account as required by the City's Ordinance. It is also due to the accounting methodologies the City has used for impact fee revenues. As a result, the Court cannot discern what specific projects or items have actually been purchased or funded with Impact Fee revenues. Further, the City's Finance Director testified that Impact Fees have been and are expended on nearly all capital expenditures made by the City, without any identifiable relationship between a given development and a specific expenditure.

## II.   THE TAX INJUNCTION ACT

The Plaintiffs' motion to remand is premised upon the argument that the City's impact fees are, in substance, taxes as opposed to fees. Accordingly, Plaintiffs argue that this Court is deprived of jurisdiction by operation of the Tax Injunction Act, 28 U.S.C. § 1341, which provides, "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The Defendants argue that the City's impact fee program charges fees, not taxes, and therefore the

TIA does not apply. The Court agrees with the Plaintiffs, and finds that the City's impact "fees" are, in substance, taxes.

The Tax Injunction Act serves as a "broad jurisdictional barrier" that "limit[s] drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Arkansas v. Farm Credit Servs. Of Cent. Ark.*, 520 U.S. 821, 825-826 (1997). The party seeking to overcome the Tax Injunction Act's bar bears the burden of showing its inapplicability. *See Amos v. Glynn Cty. Bd. Of Tax Assessors*, 347 F.3d 1249, 1256 (11th Cir. 2003) ("the burden rests on the plaintiffs to show facts sufficient to overcome the jurisdictional bar of the Tax Injunction Act") *abrogated on other grounds by Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005); *and Scott Air Force Base Properties, LLC v. Cty of St. Clair, Ill.*, 548 F.3d 516, 521 (7th Cir. 2008) ("A plaintiff who seeks to surmount the jurisdictional bar of the TIA bears the burden of demonstrating the insufficiency of the remedy available in the state court system."). In this action, it is the City of Orange Beach along with the other Defendants that have removed this action from the Circuit Court of Baldwin County, Alabama. Therefore, it is their burden to show that this Court has jurisdiction by overcoming the jurisdictional bar of the TIA.

The threshold inquiry under the TIA is whether the revenues collected by the City under the Ordinance are taxes or fees. In considering this question, the Fourth Circuit has noted:

> The "classic tax" is imposed by the legislature upon a large segment of society, and is spent to benefit the community at large. See [*San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683 (1st Cir. 1992)]. The "classic fee" is imposed by an administrative agency upon only those persons, or entities, subject to its regulation for regulatory purposes, or to raise "money placed in a special fund to defray the agency's regulation-related expenses." *Id*.

7

*Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000). Three specific factors have been considered in reaching a decision that the impact fees exacted in this action constitute a tax as opposed to fees because, "[t]he applicability of the [TIA] turns on whether the [impact] charge is a tax or instead a fee." *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000) (internal quotation marks omitted). "The classic fee is imposed (1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purpose of defraying regulatory costs, not simply for general revenue-raising purposes." (*Id.*) (*citing Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010-11 (5th Cir. 1998) ("[W]e hold that Madison's impact fee ordinance qualifies as a tax rather than a fee for purposes of the Tax Injunction Act."))).[3] In the context of impact fees, the Act and the City's Ordinance, the third element may be properly framed as whether the City's "fees" are calculated to offset the costs directly attributable to new development and spent accordingly, or whether, in substance, they are used for general revenue raising.

The first factor suggests that the impact fees are a tax since they were imposed by the city council of Orange Beach, Alabama. The second factor, on whom the fee is imposed, suggests that the impact fees constitute a fee since they are imposed on a distinct class of persons and

---

[3] The Sixth Circuit Court of Appeals has identified tests employed by a number of Circuits to assist in the analysis of whether a particular fee qualifies as a tax pursuant to the TIA. "Several other circuits use this same three-factor approach. *GenOn Mid–Atlantic, LLC v. Montgomery Cnty.*, 650 F.3d 1021, 1023 (4th Cir. 2011); *Neinast v. Texas*, 217 F.3d 275, 278 (5th Cir. 2000); *Hexom v. Ore. Dep't of Transp.*, 177 F.3d 1134, 1137 (9th Cir. 1999); *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992). *But see Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 737 F.3d 228, 231 (2d Cir. 2013) (looking solely to the purpose of the revenue to determine whether an assessment is a tax); *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 728, 730 (7th Cir. 2011) (*en banc*) (rejecting the three-factor test in concluding that an exaction on casinos was a tax because it was designed to generate revenue, not to punish (a fine) or to compensate the state for a service (a fee))." *Page v. City of Wyandotte, MI*, 666 Fed.Appx. 390, 393 (6th Cir. 2016).

companies—those seeking building permits for new developments in the city limits of Orange Beach, Alabama—and not the public at large.

Turning to the determinative factor, whether the fees were imposed for a general revenue-raising purpose as opposed to defraying the costs directly attributable to new development, it is determined that the City's impact fee program has been used as a mechanism to raise general revenues. First, the impact fees have no regulatory purpose. They are not the classical fee "designed to raise money to help defray an agency's regulatory expenses." *Madison*, 143 F.3d at 1011. Nor have any of the fees been calculated with the specific impacts of a proposed development in mind. This is critical to the Tax Injunction Act analysis because the City has undertaken no individualized inquiry of the impacts of any specific, proposed development before imposing an impact "fee." Rather, in computing fees, the City has relied exclusively on the Study's "maximum supportable fee" determination which was first established 14 years ago and has not been reviewed since. Moreover, the Study spoke only in general terms about the costs anticipated, future growth was expected to have on the City. The Study did not speak to the specific impacts of any proposed development, and the evidence does not indicate that the City undertook any such analysis prior to charging any impact fee since 2006. This lack of correlation between the actual impacts of new development and the fees assessed to developers supports the finding that these "fees" lack a regulatory purpose, and that they are not calculated to offset the costs "directly attributable to" new development.

Additional reasons support the conclusion that the City's impact fee program amounts to a general revenue raising mechanism. Although the Ordinance states as the purpose of the fees is to "assess against new developments an impact fee to finance the cost of local capital improvements proportional to the new developments' demand for the capital improvement[,]" this purpose is

9

substantially changed by that section of the Ordinance imposing a cap on the amount of fees to be imposed. The one percent cap imposed frustrates the effort to recoup proportional capital improvement costs and imposes a methodology for calculating the one percent that is based on the estimated values of the land and buildings involved, not on a proportional analysis of the increased costs with an increased demand for capital improvement. Land values have no bearing on the purposed impacts of new development, which impact fees were designed to offset. Stated differently, the value of the underlying real estate has no relationship to, "the costs of governmental infrastructure necessitated by and attributable directly to the new development." Considering the two conflicting calculations of the total impact fee to be charged, one is left with the reality that the fees exacted over a fourteen-year period have been primarily a one-percent tax imposed on each new development unit based on estimated property and building values. (Hearing Exhibit 1, pp. 2 & 4).

Additionally, it is difficult to determine if the fees collected have been spent as required by the Ordinance and the Act. In Section 8, the Ordinance clearly requires that the fees "be expended only for the type of capital improvements, for which they were imposed, calculated, and collected and according to the time limits and procedures established in this Ordinance." (*Id*., p. 5) In the next paragraph, the Ordinance identifies specific purposes for which the fees may be used: "to pay principal, interest, and other costs of bonds, notes and other obligations issued or undertaken by or on behalf of the City to finance such [capital] improvements." (*Id*.). In addition, the amended ordinance, authorizes impact fees to be spent specifically for the maintenance and upkeep of facilities or resurfacing of roadways where needed because of the impact of new development. Municipal Ordinance 2008-1077, § 1(d). However, the method for accounting for the expenditures

of fees, as reflected in Hearing Exhibit 6, does not identify specific expenditures in compliance with the Ordinance as amended.

The City's accounting method simply indicates the amount of impact fees collected and the percentages of those fees allotted to five departments of the City. The account of fees collected is followed by a list of all eligible projects within each department on which the funds may be used. The City then calculates the expenses of these eligible projects in excess of the impact fees collected. While this accounting does show the fees collected and the total monies spent on various needs in excess of the collected fees, there is no accounting for how the fees were actually spent so that a proportionality review would be possible. Thus, regardless of the requirements of the Ordinance, the City's actual practice is primarily to collect a one percent property tax on each new development unit, deposit the tax receipts into the City's general fund, divide the funds among five City departments in percentages dictated by the Study, and expend the allocated funds on one or more unidentified projects existing within each department.

The City's accounting and expenditure of impact fee revenues indicate that the impact fee program acts as a general revenue raising mechanism, further indicating that the collected impact fees are in fact taxes. Even if the Defendants are correct that the evidence shows that the impact fees do cover a portion of the infrastructure costs associated with new development, it is clear that the revenue is used to fund, in part, city services for which no fee is charged to the public at large, i.e., road maintenance as well as fire and police protection services. *See Page v. City of Wyandotte, MI*, 666 Fed.Appx. 390, 394 (6th Cir. 2016) ("The City maintains its roads and provides police and fire protection regardless of how many customers subscribe to the City's cable or hook up to its water line. And municipalities do not charge a fee-for-service to fund the police and fire departments; they impose levies, *i.e.*, taxes. The franchise fees may be a clever way to

11

surreptitiously increase the City's coffers, but we are convinced that this alternate stream of revenue is nonetheless tax revenue.")

Given that the majority of the City's Impact Fees have been calculated as 1% of the land value plus the proposed building cost, the Court finds that the revenue collected by the City has been, in the main, akin to an ad valorem tax, *i.e.*, a property tax based in substantial part on the estimated value of the property being developed. Indeed, the City's testimony was that every capital improvement project since 2006 – with the exceptions of the City Hall and a truck – were funded in part by impact fee revenues. The City's Impact Fees could, as a result, be characterized as capital improvement taxes, given that they bear no relationship to the impact of any given development. The formula used by the City for generating revenue, including the limitation on the amount of fees to be charged, was in place and clearly known before the Study was complete and before the Ordinance was adopted.[4]

Based on the City's failure to analyze the specific impacts of proposed new developments before calculating and assessing impact fees, the methodologies used by the City to compute fees, the accounting practices used by the City with relation to impact fee revenues, and the broad purposes for which impact fee revenues are expended, the Court finds that the City's impact fees are a tax. Having found that the fees are a tax, the provisions of the Tax Injunction Act are implicated.[5]

---

[4] Defendants' called Carson Bise, II, the author of the Study, as an expert witness. Mr. Bise testified that this limiting factor in the Alabama statute was unique because during his experience with preparing impact fee studies, he had never encountered a state statute that placed a limitation on the amount of impact fees that could be charged and collected by a municipality. He also testified that the land values and building values used in calculating the one percent fee were not relevant to the calculations of the maximum supportable impact fees identified in his Study.

[5] Although the Court finds that the City's impact fee program is a tax subject to the TIA, this Court may decline to exercise jurisdiction only if the state court is equipped to furnish the parties with a plain, speedy,

## III. Comity

In addition to the jurisdictional issues raised by the applicability of the Tax Injunction Act, the Court has considered what effects, if any, the doctrine of comity has on the matters at bar. "The comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction." *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 421 (2010). The *Levin* Court noted that the doctrine reflects, "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways." *Id.* (*quoting Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100 (1981). The *McNary* Court noted that the Tax Injunction Act finds its, "antecedent basis in the comity principle." *McNary*, 454 U.S. at 105. The Supreme Court in *McNary* cited *Matthews v. Rodgers*, 284 U.S. 521 (1932) and *Boise Artesian Hot & Cold Water Co. v. Boise City*, 213 U.S. 276 (1909)—both pre-TIA decisions—to demonstrate the deference district courts extended to state tax disputes even prior to the adoption of the TIA.

Although the TIA is rooted in comity, it is well settled that, "the comity doctrine is more embracive than the TIA…" *Levin*, 560 U.S. at 424. In practice, this means that while certain claims may be squarely barred by the TIA, other challenges to state tax schemes brought in federal court may nevertheless be barred by the broader comity doctrine. See *Levin*, 560 U.S. at 421 (federal consideration of taxpayer's complaint about state tax, framed as a request to increase a competitor's state tax burden, was not barred by the TIA, but was barred by the comity doctrine).

---

and efficient remedy. However, the parties have agreed, and it is the undersigned's opinion, that the Circuit Court of Baldwin County does provide adequate remedies and that none of the parties would be prejudiced by a remand to state court.

The Court finds that the Plaintiffs' challenge to the impact fee scheme in this case, unlike the challenge presented in *Levin*, directly implicates the TIA. This is because the Plaintiffs' challenge would have this Court directly "enjoin, suspend or restrain" the City's impact fee program, which, as noted above, the Court has found to constitute a tax. 28 U.S.C.A. § 1341. In light of the fact that the Tax Injunction Act finds its "antecedent basis" in the Comity doctrine, and that the two legal structures serve the same ends in this case, the Court finds that it is appropriate to decide this mater on the TIA alone, although the doctrine of comity supports the Court's decision to leave this dispute about the City's taxing authority for decision by an appropriate state court.

## III. CONCLUSION

Having determined that the City's impact fee program constitutes a tax on new development, that the Circuit Court of Baldwin County, Alabama is equipped to furnish the parties with a plain, speedy, and efficient remedy, and that the principles of comity are in accord with the Court's decision, it is RECOMMENDED that this matter be **REMANDED** to the Circuit Court of Baldwin County, Alabama.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. L.R. 72.4. The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on un-objected-to factual and legal conclusions if the party was informed of the time

period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review an appeal for plain error if necessary, in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

    DONE this 24th day of November 2020.

                  s/ WILLIAM E. CASSADY
                   UNITED STATES MAGISTRATE JUDGE